1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   GREG F. NADERI,                         Case No.  15-cv-04006-JCS

                    Plaintiff,
8
                                            **ORDER GRANTING DEFENDANT'S**
9       v.                                  **MOTION FOR SUMMARY JUDGMENT**

10  SOPHOS INC.,                            Re: Dkt. No. 20

                    Defendant.
11

## I.    INTRODUCTION

Plaintiff Greg F. Naderi asserts six claims against his former employer, Sophos Inc., all of which arise under California law.  The claims are for disability discrimination, failure to provide reasonable accommodation and engage in the interactive process, retaliation, discrimination in violation of public policy, retaliation in violation of public policy, and wrongful termination in violation of public policy.  Sophos now brings a Motion for Summary Judgment, or, in the Alternative, Summary Adjudication (the "Motion," dkt. no. 20).  A hearing on the Motion was held on August 5, 2016.  For the reasons stated below, the Motion is GRANTED.[1]

## II.   BACKGROUND

### A.    Facts

#### 1.  Naderi's Former Position at Sophos

Defendant Sophos Inc. is an American subsidiary of Sophos Ltd., an international technology company headquartered in the United Kingdom that sells antivirus, encryption, and other cybersecurity products.[2]  Declaration of Michael Valentine in Support of Defendant's

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

[2] The parties did not provide the Court with a joint statement of undisputed facts.  The Court

United States District Court
Northern District of California

Motion ("Valentine Decl.," dkt. no. 25) ¶ 2. Sophos has an office located in California. *See* Declaration of Tyler A. Brown in Support of Defendant's Motion ("Brown Mot. Decl.," dkt. nos. 22–23), Ex. 1 (Deposition of Greg Naderi, "Naderi Dep.") at 109.

Sophos sells its technology products through resellers and Managed Service Providers ("MSPs"). Valentine Decl. ¶ 2. In 2013, Sophos utilized a single, internal program for managing the sales of its products, but wanted to develop a fully redesigned program dedicated solely to its sales through MSPs. Brown Mot. Decl., Ex. 2 (Deposition of Michael Valentine, "Valentine Dep.") at 78; Valentine Decl. ¶ 2. To oversee the development of the redesigned program, Sophos hired Naderi as its Global MSP Program Director. Valentine Decl. ¶ 2. In that role, it was Naderi's job to "design, develop, and help manage all aspects of the new MSP program from 'cradle to grave.'" *Id.* Sophos described Naderi's position as follows:

> As the Director of the Global MSP (Managed Service Provider) program, you will be responsible for leading the Sophos MSP program globally. This includes program definition, product roadmap influence, pricing, enabling selling, standardization of contracts, and support of the MSP customer base that you will help to build. This aligns with our sales goals of driving global execution such that Sophos can execute with a strong MSP program that takes market share.
>
> **Main Duties**
> - Define the channel program including tiers, requirements, benefits, certification requirements
> - Define the offering/value proposition in conjunction with the product teams
> - Ensure MSP product offering meets customer needs
> - Internally champion MSP business to the sales/channel organization
> - Define pricing & SKUs in    conjunction w/product management
> - Define enablement and launch activities and plans
> - Define sales compensation approach
> - Work with marketing to evangelize our MSP program in the market place
> - Align with other departments for program execution (order processing, legal, etc)
> - Lead regional 'go to market' teams across the organization to execute and roll out the program

therefore relies on the facts that it finds are undisputed, and, where there is conflicting evidence, draws all reasonable inferences in favor of Naderi, the responding party, as required on summary judgment.

- Manage ongoing MSP contracts and relationships
- Responsible for overall MSP revenue growth and driving the business

[¶] . . . [¶]

To be successful in this position, you will need to:
- Be detail oriented and uncompromising in your standards for quality
- Be passionately focused on delivering a great online partner experience
- Be a team player that is able to drive decision-making
- Ability to work non-standard hours

Brown Mot. Decl., Naderi Dep., Ex. 5.  At various times, Naderi has indicated that travel was an important aspect of his former position, although he has stated at other times that travel was an unnecessary perk.  *See, e.g.*, Declaration of Richard Koss in Support of Opposition to Defendant's Motion for Summary Judgment ("Koss Decl.," dkt. no. 31-1), Naderi Dep. at 33 (testifying that he traveled as part of his job); Brown Mot. Decl., Naderi Dep. at 109–10 (testifying that traveling was nice, but unnecessary for his job).

In a letter dated November 26, 2013, Sophos offered Naderi the Global MSP Program Director position.  Brown Mot. Decl., Naderi Dep., Ex. 3.  This letter informed him that the position was "at-will" and he would receive a base salary of $190,000.  *Id.*  The letter also explained that Naderi would be eligible to participate in Sophos's bonus plan, stock option plan, and job-related medical and disability insurance plans.  *Id.*

Naderi started working for Sophos from its Santa Clara office on December 11, 2013.  Declaration of Greg F. Naderi ("Naderi Decl.," dkt. no. 31-2) ¶ 2.  Naderi reported to Sophos's Vice President of Worldwide Sales, a position then occupied by Andrea Lim.  Brown Mot. Decl., Naderi Dep. at 20, 23.  In January or February 2014, Lim was terminated and replaced by Michael Valentine, who had interviewed Naderi but did not make the decision to hire him.  *Id.* at 20, 23; Brown Mot. Decl., Valentine Dep. at 11; Koss Decl., Valentine Dep. at 37.

### 2.  May 2014: Naderi Delivers Presentations and Injures His Knee

On May 6, 2014,[3] in Las Vegas, Nevada, Naderi delivered the first of several planned

---

[3] All further dates stated herein refer to the year 2014 unless otherwise indicated.

United States District Court
Northern District of California

presentations regarding the MSP program.  Brown Mot. Decl., Naderi Dep., Ex. 10.  According to Naderi, the presentation was well received and people in the audience, including Vice President of Sales Communications Lee Schor, gave him positive feedback immediately after it concluded.  *Id.*

An hour later, Naderi was called into a conference room where Valentine, Schor, Kendra Krause (Sophos's Vice President of Global Channels), John Keenan, Regina Vignone, and another Sophos employee were waiting for him.  *Id.*  Valentine immediately stated that Naderi's presentation had "bombed."  *Id.*  A discussion of the presentation ensued, during which Valentine said that Sophos's CEO had told him that the presentation was off point, confusing, and contained messaging that was "completely wrong."  *Id.*  Valentine also said that the presentation was "too flashy" and that two other Sophos executives, the CFO and the Vice President of Engineering, had also criticized the presentation.  *Id.*

Shocked, Naderi replied that he had received only positive responses and that Schor had even "said that [Naderi] hit it out of the park."  *Id.*  Naderi also explained that he had reviewed the presentation with others in the room before delivering it, some of whom had given him explicit instructions to deliver it as he had, and that the CFO and the Vice President of Engineering had left the venue prior to his presentation.  *Id.*

Valentine was unmoved and reassigned all future presentations to Vignone, including the presentation scheduled for the following day.  *Id.*  Naderi then left the conference room.  *Id.*  As explained below, it is Sophos's position that Naderi inappropriately confronted Krause outside the conference room, an event that Naderi denies.  *See* Koss Decl., Naderi Dep. at 120.

On May 7, Naderi met with Valentine and Schor.  According to Naderi, Valentine admitted that the people who had criticized the presentation did not actually watch it.  Brown Mot. Decl., Naderi Dep., Ex. 10.  Valentine further explained that the criticisms were inconsistent with the feedback that he had received from those who had attended.  *Id.*  Valentine said that he was a "terrible boss."  *Id.*  Although Naderi did not deliver the presentation that had been scheduled for that day, Valentine asked Naderi to deliver the MSP program presentations scheduled to be delivered in Vietnam and the United Kingdom.  *Id.*  On May 11, Naderi spoke with Valentine, who had called to make sure that Naderi still intended to deliver the United Kingdom and Vietnam

presentations. *Id.* Naderi assured Valentine that he would. *Id.* Naderi also sent an email to Valentine in which he stated:

> I'm seeing/hearing communication go out about the MSP program and presentation. [¶] This has gone from awkward to something I can't say over email. [¶] Before I lose any more credibility, I'd like to send out an email and pull in the reigns [*sic*]. I'm holding tight until I get your thoughts/comments/suggestions?

*Id.*, Ex. 11. On May 13, Naderi delivered a presentation in the United Kingdom. *Id.*, Ex. 10. Valentine joined him onstage when the audience expressed concerns during a controversial moment of the presentation. *Id.* After Naderi finished the presentation, he received feedback, comments, and questions that were identical to those that he had received after his May 6 presentation. *Id.*

Naderi also sent two emails on May 13. In one email, sent to Vignone and two other Sophos employees, Naderi stated:

> Let's be clear, MSP communication goes through me. No more multiple voices here. [¶] Run this past me before communicating out. Any questions, seek me out directly; do not copy all.

*Id.*, Ex. 12. Vignone forwarded this email to Krause, who in turn forwarded the email to Valentine. *Id.* Replying to Krause, Valentine expressed concern about Naderi's interactions with another colleague. *Id.* Krause then asked what Valentine intended to do about the email and Valentine replied that he would call her. *Id.*

Naderi's second May 13 email was sent to Schor. *Id.*, Ex. 13. He stated:

> I'll apologize in advance for being curt on my email earlier. [¶] I need to pull in the reins on the MSP communication. Perception is reality and the reality is that I'm not leading this properly. [¶] If I'm going to be put on the grill, then I need to control the comm[unication]. [¶] I don't want to walk into a propeller again.

*Id.*

On May 15, Valentine sent a letter to Naderi that outlined the bonus that Naderi would receive for 2014. *Id.*, Ex. 4. In the letter, Valentine explained that bonus payments were dependent on three factors, among them company performance and individual performance. *Id.* Valentine then wrote that, based on those factors, Naderi had been awarded a bonus of $13,405, "which equate[d] to an individual performance multiplier of 100%." *Id.* According to Naderi, this

bonus corresponded to his performance, which he described as being 116% of his goal between December 2013 and April 2014.  Naderi Decl. ¶ 3.  Naderi received this bonus with Sophos's payment of his May salary.  Naderi Decl. ¶ 3.

On May 22, Naderi attended Sophos's Vietnam partner conference.  Brown Mot. Decl., Naderi Dep., Ex. 10.  Naderi severely injured his knee while he participated in the conference's festivities.  *Id.*

On May 23, Naderi saw a doctor and was taken by ambulance for an x-ray and a magnetic resonance imaging (MRI) of his knee.  *Id.*  He was diagnosed with a fractured tibia, torn meniscus, and torn anterior cruciate ligament (ACL).  *Id.*  Valentine first learned of Naderi's knee injury that day when someone other than Naderi called him and requested that Valentine approve a business-class upgrade for Naderi's flight home.  Brown Mot. Decl., Valentine Dep. at 70–71; Valentine Decl. ¶ 5.  Valentine approved the request and Naderi returned to California.  Valentine Decl. ¶ 5.

Valentine also received an email from Schor on May 23.  Brown Mot. Decl., Naderi Dep., Ex. 14.  In it, Schor stated that Naderi needed to focus.  *Id.*  Schor specifically noted two issues: one was Naderi's failure to respond to a colleague's request for information; the other was Naderi's failure to attend two conference calls, both of which Naderi had organized himself.  *Id.*  Valentine responded that he would address Schor's concerns with Naderi.  *Id.*

During the week of May 26, Naderi notified Valentine by phone and email that he had injured his knee.  Naderi Decl. ¶ 4.  Naderi told Valentine that his injury would impact his performance and mobility and require surgery.  Brown Mot. Decl., Naderi Dep. at 77–78.  Naderi asked Valentine if he should report the injury to Sophos's human resources department ("HR").  Naderi Decl. ¶ 4.  Naderi also asked to discuss his regimen and schedule with Valentine, and said that he needed to travel to Singapore and the United Kingdom in the near future.  Brown Mot. Decl., Naderi Dep. at 94–96.

According to Naderi, Valentine told him that "there was no coverage for his injury." Naderi Decl. ¶ 4.  Valentine further advised Naderi not to report the injury to HR, saying "[h]old off on that for now."  Brown Mot. Decl., Naderi Dep. at 77–78.  Valentine said that they would discuss Naderi's injury after Valentine returned from a planned vacation, and that Naderi did not

United States District Court
Northern District of California

need to travel while he recovered.  *Id.* at 78–79, 96.  Valentine advised Naderi that he could

continue working and do so from home.  Brown Mot. Decl., Valentine Dep. at 75.  As a result,

Naderi continued working, making calls and sending emails, and did not report his injury to HR

because he "didn't think Mr. Valentine had anything but his best interests" in mind.  Brown Mot.

Decl., Naderi Dep. at 80–81; *see also* Naderi Decl. ¶ 4.

### 3.  Naderi's Requests for Help

Sometime after their end of May conversation, Naderi asked Valentine and other Sophos

employees for help.  Koss Decl., Naderi Dep. at 149–50.  Although it is unclear precisely when

Naderi asked for help, he specifically requested three forms of assistance.[4]

First, Naderi asked Valentine and others if Sophos could designate a person to serve as

Naderi's proxy to represent him and address MSP program pricing models at the Singapore and

United Kingdom meetings, which he was physically unable to attend due to his knee injury.

Brown Mot. Decl., Naderi Dep. at 102–03.  Regarding this request, Naderi testified:

> I asked for help from the field to help me on certain things, and I
> wanted to see what kind of help I could get from corporate. Folks in
> Boston or HR, is there anything I can get help with? Can an intern
> be hired temporarily to help me with some of these things? . . . You
> know, I wanted something.  I didn't know what it was.

Koss Decl., Naderi Dep. at 149–50.  Naderi did not recall whether Valentine responded to the

proxy request, but Sophos did not designate a proxy or otherwise provide a way for Naderi to

physically represent himself at the meetings in Singapore and the United Kingdom.  Brown Mot.

Decl., Naderi Dep. at 102–03.  Due to his personal knowledge and relationships, Naderi's absence

from the meetings negatively impacted the MSP program.  *Id.* at 104.

Second, Naderi requested that Valentine and other Sophos colleagues help him access data.

Reply Decl. of Tyler A. Brown in Support of Defendant's Motion ("Brown Reply Decl.," dkt.

---

[4] Naderi states in his declaration that he "needed a reasonable accommodation from [his]
employer.  Valentine refused to offer [him] any reasonable accommodation as a result of [his]
disability."  Naderi Decl. ¶ 6.  Naderi also states that Sophos "did not enter into the interactive
process with [him], but rather terminated [him] three weeks after [his] surgery."  *Id.* ¶ 7.  These
statements are legal conclusions to be drawn from the record, not facts.  The Court therefore
considers the statements only to the extent that they are reflected in the evidence otherwise
provided in the record.

no. 32-1) Naderi Dep. at 165–66.  Rather than assisting Naderi with accessing the data that he

needed, Valentine instructed Naderi to find a way to access the data himself.  *Id.*  Through

WebEx, Naderi communicated with Paul Warren, who provided Naderi with data and an analysis

of the MSP program, which Naderi found helpful.  *Id.*; Brown Mot. Decl., Naderi Dep. at 150–51.

Naderi also had other positive experiences receiving assistance from other colleagues, including

Vignone and Keenan.  Brown Mot. Decl., Naderi Dep. at 106–08, 151–52.  However, Naderi

specifically remembered telling Valentine that he was struggling to access data because he was

unable to attend the United Kingdom meetings and personally instruct the Sophos employees who

could best assist him.  Brown Reply Decl., Naderi Dep. at 165–66.

Third, Naderi asked Valentine for support, which he described as "executive inertia," to

help Naderi convince Sophos executives to make their products more compatible with the MSP

program.  Brown Mot. Decl., Naderi Dep. at 105.  According to Naderi, Valentine refused this

request and to otherwise assist him in any way.  *Id.*; *see* Naderi Decl. ¶¶ 6, 8.

### 4.   June and July 2014: Naderi Undergoes Surgery and Is Terminated

On June 14, Naderi emailed Valentine.  Brown Mot. Decl., Naderi Dep., Ex. 15.  The

email stated that Naderi would undergo knee reconstruction surgery on June 23 and be on crutches

for three to four weeks thereafter.  *Id.*  Naderi asked to meet with Valentine before the surgery to

discuss his assignments.  *Id.*  Naderi also reminded Valentine that the injury would preclude

Naderi from traveling.  *Id.*  Valentine replied that he understood, hoped all would go well, and that

they would talk soon.  *Id.*

On June 17, Naderi emailed Natalie Rice, who worked in HR, and asked her two questions.

Brown Reply Decl., Naderi Dep. at 90.  Because Naderi was planning to rehabilitate his knee, he

first asked about his health benefits and how they related to gym memberships.  *Id.*  Second, he

asked how he should to handle the increased expense incurred for the upgrade of his flight home

from Vietnam.  *Id.*  Rice responded, explaining how Sophos reimbursed employees for fitness

expenses.  *Id.*  Rice also asked to discuss Naderi's injury telephonically, stating that she preferred

verbal conversations to email correspondence for addressing such issues.  *Id.* at 92.  According to

Naderi, he "did not have a full conversation about [his injury] . . . .  [Rice] left the company

8

shortly after" their email exchange.  *Id.* at 93.  During his deposition, Naderi could not recall whether he made other efforts to contact HR.  *Id.*

Sometime in June, Naderi set up an out-of-office email message that was sent on June 19. *Id.*, Ex. 16.  He stated that he was having a "minor procedure performed on Monday, June 23rd." *Id.*  It further stated that Naderi hoped to be "back online" later that afternoon and that he would resume traveling in mid- to late-July.  *Id.*  Naderi testified that his hopes of quickly returning to work were based on his personal optimism, not a conversation with his doctor.  *Id.* at 86–87.

Naderi worked the morning of June 23, then underwent a successful knee operation later in the day. Naderi Decl. ¶ 2.  After the surgery, Naderi was medicated and "loopy" for a "few days." Koss Decl., Naderi Dep. at 125.

Naderi resumed working on June 24.  Naderi Decl. ¶ 4.  In his declaration, Naderi attests that, on that day, he told Valentine that he was unable to walk due to his injury and surgery. *Id* ¶ 5.  He again reminded Valentine that he could not travel until he had recovered.  *Id.*  He also explained that his injury caused him great pain for which he needed pain relief medication.  *Id.*

In his deposition, Naderi also described a conversation that he had with Valentine after Valentine returned from vacation, although Naderi could not remember whether the conversation occurred before or after his surgery.  Brown Mot. Decl., Naderi Dep. at 97–98.  In that conversation, the two addressed aspects of the MSP program and how Naderi's injury had happened.  *Id.*  Valentine was sympathetic to Naderi's injury.  *Id.*

On July 2, Naderi informed Valentine by email that his surgery was successful and he was recovering.  Brown Reply Decl., Naderi Dep. at 88, Ex. 17.

On July 8, Naderi participated in a conference call with five or six colleagues, among them Melanie Nooney, a Sophos in-house attorney.  Brown Mot. Decl., Naderi Dep. at 111.  One of the participants later informed HR that Naderi had acted inappropriately toward Nooney during the call.  Declaration of Jared Sharp in Support of Defendant's Motion ("Sharp Decl.," dkt. no. 24) ¶ 2. Jon Gardner, who worked in HR, conducted an investigation, notified Naderi of the complaint, and interviewed the participants.  *Id.* ¶ 3.  Nooney conveyed to Gardner that she was offended by Naderi's conduct.  Brown Mot. Decl., Naderi Dep. at 112, 118, Ex. 20.  Although

United States District Court
Northern District of California

1   some of the other call participants considered Naderi's behavior inappropriate, some did not.

2   Sharp Decl. ¶ 3, Ex. A.

3         Naderi recounted his perspective of the call in a July 10 email to Gardner.  Brown Mot.

4   Decl., Naderi Dep. at 115, Ex. 20.  Describing the events leading to the call, Naderi explained that

5   his interactions with Nooney started several months earlier and regarded a potential partnership

6   between Sophos and an outside company.  *Id.*  Due to miscommunications and misunderstandings,

7   Naderi ultimately did not receive sufficient cooperation and information from Nooney regarding

8   the potential partnership and, as a result, Naderi contacted another Sophos colleague.  *Id.*  That

9   colleague notified Nooney, who may have incorrectly but understandably believed that Naderi had

10  attempted to circumvent her.  *Id.*  On July 8, when Naderi attempted to lead the conference call,

11  Nooney repeatedly interrupted him and prevented other call participants from hearing his

12  statements.  *Id.*  After Naderi asked Nooney to wait until he had finished making his points, she

13  continued to speak over him and address different topics.  *Id.*  Naderi considered Nooney's tone

14  inappropriate.  *Id.*  As a result, he asked her to stop patronizing and condescending him, and to

15  wait for him to finish his statements.  *Id.*  Naderi further explained that he did not believe Nooney

16  was aware of her tone, that he harbored no ill will toward her, and that she was doing a good job.

17  *Id.*

18        After Gardner completed his investigation, he provided his notes to Jared Sharp, Sophos's

19  HR manager.  Sharp Decl. ¶ 4.

20        On July 16, Ari Buchler (Sophos's General Counsel), Sharp, and Valentine decided to

21  terminate Naderi.  Sharp Decl. ¶ 4, Ex. B.  According to Naderi, Valentine then told Sharp that

22  Naderi had inappropriately confronted Krause outside the Las Vegas conference room on May 6—

23  an event that Naderi denies occurred—to strengthen the facts underlying their decision to

24  discharge him.  *See* Koss Decl., Naderi Dep. at 120.  Sharp asked Krause to provide a summary of

25  the confrontation for him.  Sharp Decl. ¶ 4.  Krause complied and stated in an email as follows:

26            After a meeting that Make Valentine called and that both Greg and I
          attended, Greg asked to speak with me. We spoke as we walked to

27            the next meeting room. I started the conversation saying something
          to the effect of "this can't be easy, there is so much going on, and I

28            hope he doing okay thru this". He then turned to be face to face to

United States District Court
Northern District of California

> me and stepped in too close. He raised his finger to me, pointing in my face, and said 'You fucking back stabbed me. Don't you dare back stab me ever again'. I told him I didn't know what he was talking about and that if he was talking about the meeting he should talk to Mike who called the meeting. He told me I argued with him in the meeting, which I told him that I did not argue and that I was stating my opinion. Between his raised voice, being in my face, and the raised finger, I felt threatened and so I turned and walked away.

Brown Mot. Decl., Naderi Dep., Ex. 21 (original spelling and style).

Later that day, Sharp sent an email to Ken Paul, the Global HR Director, stating that he, Valentine, and Buchler had decided to discharge Naderi. Koss Decl., Valentine Dep., Ex. 9. Sharp also explained:

> I will be flying out tomorrow to [Santa Clara] to execute with Mike Friday AM. ([Valentine] will pickup [*sic*] the travel costs) I was lucky to get 2 middle seats and the last hotel room (handicap) available! [¶] This will be a no severance termination based on misconduct and underperformance.

*Id.*

Paul responded, addressing Naderi's alleged incidents with Nooney and Krause:

> For the [Nooney] incident alone I'd think it was pretty severe but in the wider context and with the [Krause] incident I think we have a stronger case. In my mind, looking at the notes, the [Krause] incident is far more severe than the [Nooney] incident but combined show an approach that is bullying in style and directed at female staff (which may or may not be a coincidence). We have exercised our duty of care as neither raised a formal issue with us.

*Id.*

On July 18, Valentine and Sharp informed Naderi that Sophos was terminating his employment due to Naderi's failure to "rally the troops, reach a consensus in the team." *Id.* at 123–24, Ex. 10. At no point during Naderi's employment with Sophos did Valentine conduct a formal work evaluation of Naderi. Koss Decl., Valentine Dep. at 93.

Naderi did not take any medical leave or paid time off for his injury from the time that it occurred through his termination. Brown Mot. Decl., Naderi Dep. at 98; Brown Reply Decl., Naderi Dep. at 94.

On July 27, Naderi submitted a form to California's Employment Development Department. Brown Mot. Decl., Naderi Dep. at 136–37. Therein he stated, under penalty of perjury, that he was not too sick or injured to work from July 13 to July 26 and was otherwise able

to accept fulltime work during that period.  *Id.* at 136–37, Ex. 28.

### B.   Sophos's Asserted Reasons for Terminating Naderi

In its Motion, Sophos asserts that it discharged Naderi for underperformance and verbal abuse of colleagues.  Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Memorandum," dkt. no. 21) at 10.

In his deposition, Valentine attested that Sophos discharged Naderi for three reasons. First, Naderi failed to launch a competent MSP program during his tenure or otherwise meet the objectives assigned to him.  Brown Mot. Decl., Valentine Dep. at 100.  Second, Naderi had demonstrated an inability to build relationships and provide leadership, alienating coworkers whose cooperation was needed to build a successful MSP program.  *Id.*  Third, Naderi had acted inappropriately in confrontational interactions with coworkers, including his behavior toward Nooney on the July 8 conference call.  *Id.* at 100-01.

Naderi states that these reasons for terminating him are false.  Naderi Decl. ¶ 7. Emphasizing that he received a bonus for his job performance, he attests that there had been no work-related problems before his surgery.  *Id.*

### C.   Naderi's Deposition Testimony

During his deposition, Naderi made statements that are particularly relevant to the Court's analysis.  In one instance, Naderi addressed his performance, explaining:

> I just want to make it clear that I was performing my duties at my job from home base, which is California, via WebEx, conference calls, e-mails, and that seemed to be my primary way of continuing with my job, and that I could continue doing that with—with no issues. [¶] The travel part was nice to have. It wasn't necessary, since those field representatives had the primary contacts and relationships, so I did not necessarily have to be in those regions, so I could take care of all of those things remotely.

Brown Mot. Decl., Naderi Dep. at 109–10.  Naderi then agreed that "there was no push-back at all for . . . working at home through e-mail, telephone calls, [and] WebEx."  *Id.*  Naderi also testified that he believed he was satisfactorily performing his job from home and that he could not recall anyone from Sophos telling him that he could not perform his job without traveling.  *Id.* Similarly, Naderi later testified:

> I could have done the job. There was no reason—I was doing WebEx. I was doing conference calls. I was communicating with the team. It was all working out well.

*Id.* at 147.

Naderi also testified that he did not request anything other than a proxy and data pulls to accommodate his injury. *Id.* at 168. Regarding the data pulls, Naderi testified that Valentine had refused to assist him with accessing data *before* his injury and that Valentine's response to his requests for assistance with accessing data was similarly nonspecific and not helpful after the injury occurred. *Id.* at 166.

Naderi also addressed the unemployment form that he filed with California's Employment Development Department, testifying that his statements in the form were true and that he was not too sick or injured to work from July 13 to July 26. *Id.* at 136–37.

Finally, regarding the reasons for his termination, Naderi testified that he believed there were other reasons for his termination, but did not know what those reasons were. *Id.* at 131.

**D.    Naderi's Declaration**

Naderi's Declaration was filed with his Opposition. In it, he attested that he had requested reasonable accommodation from Sophos. Naderi Decl. ¶ 6. He further declared as follows:

> I complained to Mike Valentine about the discriminatory treatment and that he would not 'help' me or get me assistance to perform my duties during the period when I was disabled and unable to travel as required by my job. I felt I could perform my duties had Mr. Valentine responded to my complaints. Instead, Mr. Valentine did not respond to my voicemails, texts and emails. I also raised a complaint to Natalie Rice in HR after I had repeatedly informed Mr. Valentine that I needed accommodations for my role and inability to travel. Neither Mr. Valentine nor Ms. Rice discussed accommodations for my role after my injury and during my disability.

*Id.* ¶ 8.

**E.    The Complaint**

Naderi initiated this action on July 27, 2015, filing his Complaint in the Superior Court of California, County of Santa Clara. Notice of Removal ("NOR," dkt. no. 1), Declaration of D. Ari Buchler (dkt. no. 1-1), Ex. A (the "Complaint"). On September 2, 2015, Sophos timely removed the case to this district. *See* NOR.

13

United States District Court
Northern District of California

1    Naderi's Complaint asserts seven claims: (1) disability discrimination in violation of

2    California's Fair Employment and Housing Act ("FEHA," *see* Cal. Gov't Code § 12940);

3    (2) failure to engage in an interactive process or provide reasonable accommodation in violation of

4    FEHA; (3) retaliation for requesting accommodation in violation of FEHA; (4) breach of contract;

5    (5) disability discrimination in violation of public policy; (6) retaliation in violation of public

6    policy; and (7) wrongful termination in violation of public policy.  Compl. 5–15.  Naderi also

7    claims that he is entitled to recover punitive damages from Sophos.  *Id.* at 15–16.

8    **F.    The Motion**

9    The parties stipulated to the dismissal of Naderi's breach of contract claim, which the

10   Court granted with prejudice.  *See* dkt. nos. 29, 30.  Sophos now seeks summary judgment on

11   Naderi's remaining claims, first contending that summary judgment is appropriate because Naderi

12   was not disabled as a matter of law, thus negating each of his claims.[5]  Mem. at 10–12.  Citing

13   several federal cases interpreting the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*

14   ("ADA"), Sophos argues that Naderi's knee injury did not constitute a disability and that he has

15   failed to show that his injury limited or interfered with the performance of his job duties.  *Id.*

16   From this, Sophos concludes that Naderi's discrimination and failure to accommodate claims both

17   fail as a matter of law, and the remaining claims fail as derivatives of those two.  *Id.*

18   Turning to the burden-shifting framework explained in *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.

19   4th 317, 355–56 (2000), Sophos next contends that Naderi cannot factually establish a prima facie

20   case of discrimination or failure to reasonably accommodate a disability.  Mem. at 12–15.

21   According to Sophos, Naderi's admission that he was not too injured or ill from July 13 to July 26

22   negates the first element of the prima facie case for both claims: that Naderi was disabled at the

23   time of his discharge.  *Id.*  Sophos also argues that Naderi cannot establish that its stated reasons

24   for discharging him were pretext, pointing out that Naderi admitted to underperforming before he

25   became injured and that he has merely speculated that Sophos had other reasons for discharging

26

27   ───────────────

[5] Sophos also emphasizes that Naderi's employment was "at-will," which the Court finds to be
28   irrelevant to its analysis.  *See* Mem. at 9–10.

him.  *Id.*

Sophos also contends that Naderi has failed to establish a prima facie case of retaliation under FEHA.  *Id.* at 16.  Arguing that he never in fact engaged in a FEHA protected activity, Sophos asserts that Naderi did not make a complaint of disability discrimination—that his alleged requests for reasonable accommodation are insufficient to prove this element.  *Id.*  Sophos also reiterates that Naderi has not established pretext, and, as a result, retaliation cannot be presumed or proved to be intentional.  *Id.*

Sophos next contends that Naderi's public policy claims for disability discrimination, retaliation, and wrongful termination fail as a matter of law.  *Id.* at 17–18.  Sophos argues that public policy violation claims asserted under *Tameny v. Atl. Richfield Co.*, 27 Cal. 3d 167 (1980), must be supported by a proper statutory basis.  *Id.*  Sophos further argues that, here, Naderi was not disabled under FEHA and, therefore, there is no underlying statutory basis for the violations of public policy that he has asserted.  *Id.*  In a footnote, Sophos also argues that there is no legal basis for either of Naderi's claims for disability discrimination in violation of public policy or retaliation in violation of public policy.  *Id.* at 18 n. 3.

Finally, Sophos contends that Naderi's punitive damages claim fails, arguing that Naderi cannot prove that Valentine was a managing agent of the company and that the conduct Naderi has alleged does not constitute fraud, oppression, or malice.  *Id.* at 18–19.

In his Opposition, Naderi contends that he has established a prima facie case of disability discrimination under FEHA and the four elements set forth in *Guz.*  Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Opposition," dkt. no. 31) at 6–7.  Those elements are as follows: (1) the plaintiff was a member of a protected class, i.e., he was disabled; (2) the plaintiff was qualified for the employment position that he sought or was performing competently in the position that he held; (3) the plaintiff suffered an adverse employment action; and (4) some other circumstance suggests that the employer had a discriminatory motive.  *Guz*, 24 Cal. 4th at 355; *see* Opp'n at 7.

Addressing the first element, Naderi argues that there is sufficient evidence to conclude that he was disabled.  *Id.* at 7–8.  Naderi specifically disputes Sophos's reliance on federal cases,

arguing that the definition of a physical disability under FEHA includes the circumstance of an employee being regarded or treated by an employer as having, or having had, a physical condition that makes achievement of a major life activity difficult, namely work. *Id.* Naderi further argues that, because he was unable to perform the extensive travel required for his job without reasonable accommodation, his knee injury constituted a disability.[6] *Id.*

Turning to one part of the second element stated in *Guz*, Naderi contends that he was qualified to be Sophos's Global MSP Program Director, arguing that Sophos's description of the position does not set forth extensive travel as a duty or required skill. *Id.* at 8–9. Sophos does not contest that Naderi was qualified at the time he was hired. Sophos does argue that Naderi was not performing competently, the other part of the second element provided in *Guz*, which Naderi does not expressly address in his brief, but can be inferred from arguments he has raised regarding other elements.

Naderi contends that, as to the third element, his termination constituted an adverse employment action, another point that Sophos does not contest. *Id.* at 12–13. Naderi then argues that Sophos has failed to produce evidence supporting the assertion that it discharged Naderi for underperforming, pointing out he had not been reprimanded and Sophos did not consider terminating him prior to his injury. *Id.*

As to the fourth *Guz* element, Naderi contends that the circumstances of his discharge suggest that Sophos acted with discriminatory intent and that its stated reasons for discharging him are pretext. *Id.* at 13–14. He specifically argues that Sophos's explanation for discharging him "simply does not add up" because there had been no problem with his performance prior to his injury and he received a performance bonus. *Id.* He further asserts that the alleged May 6 incident between him and Krause, which he has denied occurred, was reported by Valentine after Sophos had decided to terminate him to serve as further justification for its decision. *Id.*

Naderi also contends that, under *Jensen v. Wells Fargo Bank*, 85 Cal. App. 4th 245,

---

[6] Naderi also notes that he was "loopy" due to his pain medication, but does not elaborate on whether this constituted a disability or otherwise affected his disability status. Opp'n at 8.

16

263 (2000), Sophos knew of his injury and that he had requested help for it, but failed to reasonably accommodate him or engage in an interactive process with him.[7]  Opp'n at 9–11.  He argues that Sophos's knowledge imposed a duty to initiate an interactive discussion with him to determine whether reasonable accommodations could improve his ability to work.  *Id.*  He further argues that whether he requested accommodation (and how general or specific that request was) is of no import, and that Sophos could not fulfill its duty in a single effort.  *Id.*

Turning to the record, Naderi also argues that he in fact attempted to initiate an interactive process, requesting a proxy and additional support for overseas meetings, but did not receive a response from Sophos.  *Id.*  Naderi further points out that Sophos has failed to produce "a completed reasonable accommodation form" and that Valentine did nothing to accommodate him, both of which evidence Sophos's failure to properly engage in an interactive process.  *Id.* at 10.

Addressing his retaliation claim, Naderi contends that he has established a prima facie case.  *Id.* at 14–15.  He argues that his termination followed soon after he sustained an injury for which he needed accommodation and complained to Valentine and HR that Sophos had failed to provide him with one.  *Id.*  He asserts that the temporal proximity of these events is sufficient to establish a causal link between his complaint and discharge.  *Id.*

Naderi contends that his wrongful termination in violation of public policy claim must survive Sophos's Motion, arguing that, because his FEHA claims survive, so too must the wrongful termination claim.  *Id.* at 14.

Asserting a claim not contained in the Complaint, Naderi contends that Sophos failed to prevent discrimination in violation of public policy and FEHA, citing California Government Code § 12940(k).  *Id.* at 11–12.  He argues that this failure to prevent claim survives summary judgment due to the strength of his other FEHA claims.  *Id.*  He also mentions that disability

---

[7] In the Complaint, Naderi alleges failure to accommodate and failure to enter into the interactive process as a single cause of action.  *See* Compl. at 7–9.  In his Opposition, Naderi treats failure to accommodate and failure of the interactive process as distinct, "principle claims [that] withstand Sophos'[s] summary judgment motion."  *See* Opp'n at 5.  Because he relies on the same arguments for both in his Opposition, the Court consolidates them here to reflect the cause of action that is defined in the Complaint.

United States District Court
Northern District of California

discrimination resulting in wrongful termination constitutes a public policy exception to the at-will employment rule when there is a nexus between the wrongful termination and the discriminatory conduct. *Id.* He asserts that such a nexus exists in this case and, as a result, there remains a genuine issue of material fact for this claim. *Id.*

Naderi finally contends that he is entitled to punitive damages because Sophos's asserted basis for terminating him "smacks of fraud." *Id.* at 15–17. He also asserts that Valentine and Sharp were managing agents of Sophos who acted discriminatorily toward Naderi, which is inherently malicious conduct under *Cloud v. Casey*, 76 Cal. App. 4th 895, 912 (1999). Opp'n at 17.

In its Reply brief, Sophos first reiterates its position that Naderi has failed to establish that he was disabled under California law. Reply to Plaintiff's Opposition to Defendant's Motion ("Reply," dkt. no. 32) at 1–2. Sophos emphasizes that, in his Opposition, Naderi failed to rebut its citation to federal authorities. *Id.* Sophos also asserts that a contradiction lies in Naderi's position: Naderi simultaneously argues that his injury prevented him from traveling while also arguing that travel was a nonessential aspect of the job. *Id.* Sophos further argues that Naderi has admitted that travel was not essential in his testimony, and that Sophos has independently established that travel was not essential to the Global MSP Program Director position. *Id.* Sophos also emphasizes that Naderi was permitted to work remotely.[8] *Id.*

Sophos also contends that Naderi failed to address its argument that he was not in fact disabled at the time of his discharge and, therefore, the Court should consider this argument unopposed. *Id.* at 2–3.

Sophos next contends that Naderi has failed to establish a question of fact regarding his failure to accommodate and engage in an interactive process claim. *Id.* at 3. First, Sophos argues that Naderi's reliance on *Jensen* is improper, and contends that the applicable legal standard is articulated in *Scotch v. Art Institute of California–Orange Cnty.*, 173 Cal. App. 4th 986, 1009–10

---

[8] Sophos also mentions that Naderi has asserted that he felt "loopy" for the first time in his Opposition, but that Naderi has failed to establish that this constituted a disability. Reply at 2.

(2009). Reply at 3–4. Sophos further asserts that, under *Scotch*, Naderi's requests for a proxy were unreasonable and unnecessary for him to perform adequately. *Id.* at 4–5. Sophos also asserts that it permitted Naderi to work from home, attend meetings telephonically, and communicate with colleagues through WebEx, all of which constituted a more reasonable accommodation that allowed Naderi to perform the essential functions of his job. *Id.*

Second, Sophos argues that it in fact engaged in an interactive process with Naderi, evidenced by Naderi's admissions to numerous discussions with Valentine and HR about his injury and potential accommodations. *Id.* at 5–6. Sophos further argues that, even if Naderi had established that Sophos failed to engage in the interactive process, he has not demonstrated that proper engagement would have remedied the job-related problems that arose after his injury. *Id.* at 7. Responding specifically to Naderi's argument that the absence of a reasonable accommodation form evidences Sophos's failure to properly engage in an interactive process, Sophos states that California law only requires employers to talk and work with a disabled employee; it does not require formal conversations or documentation. *Id.* at 5–7. Sophos also argues that it was not required to continue its interactive process with Naderi because the accommodations that it had provided—permitting Naderi to work from home and attend meetings remotely—were working for both parties. *Id.* Sophos further emphasizes that Naderi has not asserted a need for reasonable accommodation other than his proxy request and concludes that he has failed to identify a reasonable accommodation objectively available to Sophos during the period of his disability, which necessarily defeats his accommodation and interactive process claim. *Id.*

Turning to Naderi's discrimination and retaliation claims, Sophos contends that Naderi has failed to establish a nexus connecting his disability and alleged protected activity to his discharge. *Id.* at 7–8. According to Sophos, Naderi merely relies on the temporal proximity between his injury and discharge as well as "strange circumstances leading to [his] dismissal." *Id* at 8 (quoting Opp'n at 14). Sophos argues that both fail to adequately demonstrate that Sophos's legitimate, nondiscriminatory explanation for terminating him is false or that his termination was motivated by discrimination. *Id.* Elaborating further, Sophos asserts that Naderi's poor performance is

19

clearly evidenced by his admissions to professional struggles and missteps before his injury, and that the only evidence of his adequate performance is contained in his declaration. *Id.* at 8–9. Responding directly to another of his factual assertions, Sophos argues that, although Valentine's failure to timely report the incident between Krause and Naderi was inappropriate, the delay does not render that incident less inflammatory or concerning. *Id.* at 10–11.

Finally, Sophos briefly addresses certain arguments made in the Opposition. Regarding the wrongful termination in violation of public policy claim, Sophos argues that Naderi has failed to establish an issue of fact and that his contention to the contrary is legally incorrect. *Id.* at 11–12. Sophos also points out that Naderi's failure to prevent claim is not contained in the Complaint and argues that it would fail as a matter of law. *Id.* As to punitive damages, Sophos contends that Naderi misstates *Cloud*. *Id.* at 12–13. Sophos also argues that Naderi cannot prove that Sophos acted fraudulently or that Valentine or Sharp acted maliciously. *Id.*

## III.    ANALYSIS

### A.    Legal Standard under Rule 56

Summary judgment on a claim is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or to a defense on which the nonmoving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Furthermore, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact," that is, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation marks omitted). Once the movant has made this showing, the burden shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at trial on

United States District Court
Northern District of California

1    the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  On summary judgment,

2    the hearing court draws all reasonable factual inferences in favor of the nonmovant.  *Id.* at 255.

3         **B.    *McDonnell Douglas* Standard**

4         Naderi asserts disability discrimination and related claims under FEHA.  For such claims, a

5    plaintiff who has no direct evidence of discriminatory conduct may prove discrimination using

6    indirect or circumstantial evidence, under the burden-shifting framework established in

7    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Guz*, 24 Cal. 4th at 354 (2000)

8    (holding that, because of similarity between state and federal employment discrimination laws,

9    California has adopted the *McDonnell Douglas* approach to claims of discrimination under

10   FEHA).  The *McDonnell Douglas* framework requires the plaintiff to establish a prima facie case

11   of discrimination.  *Hawn v. Exec. Jet Mgmt, Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010).  The

12   elements of a prima facie case of discrimination under FEHA are generally set forth in *Guz*, as

13   outlined above.  *Guz*, 24 Cal. 4th at 355.  "At summary judgment, the degree of proof necessary to

14   establish a prima facie case is minimal and does not even need to rise to the level of a

15   preponderance of the evidence."  *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (citing

16   *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)) (internal quotation marks and italics

17   omitted).

18        If the plaintiff establishes a prima facie case, the burden of production, but not persuasion,

19   shifts to the employer to articulate one or more legitimate, nondiscriminatory reasons for the

20   challenged actions.  *Hawn*, 615 F.3d at 1155.  If this burden is met, the plaintiff "must then raise a

21   triable issue of material fact as to whether the defendant's proffered reasons for [the employee's]

22   termination[] are mere pretext for unlawful discrimination."  *Id.*

23        To establish pretext, the employee must offer "specific, substantial evidence of [it]."

24   *Wallis*, 26 F.3d at 890 (quoting *Steckl v. Motorola*, 703 F.2d 392, 393 (9th Cir. 1983)) (internal

25   quotation marks omitted).  Evidence of pretext must be considered cumulatively.  *Chuang v. Univ.

26   of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1129 (9th Cir. 2000).  "The plaintiff may show pretext

27   either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by

28   showing that the employer's proffered explanation is unworthy of credence because it is

United States District Court
Northern District of California

inconsistent or otherwise unbelievable." *Dominguez-Curry v. Nev. Transp. Dept.* 424 F.3d 1027, 1037 (9th Cir. 2005) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220–22 (9th Cir. 1998). An employer's nondiscriminatory reason is not rebutted where "the employee simply show[s] the employer's decision was wrong, mistaken, or unwise." *Horn v. Cushman & Wakefield Western, Inc.*, 72 Cal. App. 4th 798, 807 (1999).

### C. Disability Discrimination

Sophos contends that, under FEHA, Naderi was not disabled and that Naderi cannot establish that travel was an essential duty of his employment. The Court agrees with these contentions and finds that Sophos is entitled to summary judgment on this claim.

#### 1. Prima Facie Case of Disability Discrimination

FEHA provides, in pertinent part, that it is an unlawful employment practice "[f]or an employer, because of the . . . physical disability . . . of any person, to refuse to hire or employ the person or . . . discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions or privileges of employment." Cal. Gov't Code § 12940(a). A prima facie case of disability discrimination requires Naderi to establish that he (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations; and (3) was subjected to an adverse employment action because of the disability or perceived disability. *Wills v. Super. Ct.*, 195 Cal. App. 4th 143, 159–60 (2011); *see also Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 344–45 (2008); *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 797 (N.D. Cal. 2015).

#### 2. Naderi Cannot Establish That He Suffered from a Disability

In general, "FEHA contains a broader disability standard than does the ADA," which is made clear by its statutory language and the courts that have interpreted it. *Diaz v. Fed. Express Corp.*, 373 F. Supp. 2d 1034, 1049 (C.D. Cal. 2005). Among FEHA's several nonexclusive definitions of "physical disability" is being regarded or treated by the employer as having, or having had, any physical condition that makes achievement of a major life activity difficult. Cal. Gov't Code § 12926(m)(4). Naderi has asserted that, under this section, work is a major life activity the achievement of which was made difficult by his injury. *See* Opp'n at 7–8. Naderi is

United States District Court
Northern District of California

1   correct that FEHA regards work as a major life activity. *See* Cal. Gov't. Code § 12926(m)(1)(iii).

2   However, not every "difficulty" is a disability—some are injuries that do not rise to the level of a

3   disability. To be a disability, a condition must interfere with a major life activity. *See* Cal. Gov't

4   Code § 12926(m)(4). In that regard, Naderi's showing falls short.

5       The Court finds *Leatherbury v. C & H Sugar Co., Inc.*, 911 F. Supp. 2d 872, 880 (N.D.

6   Cal. 2012), instructive. There, the defendants argued that the plaintiff's chronic knee pain did not

7   constitute a disability under FEHA. *Id.* Concluding that the defendants were correct, the

8   *Leatherbury* court explained that, although pain alone could constitute a disability under FEHA,

9   such pain must actually limit the plaintiff's ability to participate in a major life activity, i.e., work.

10  *Id.* (citing *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 347 (2008)).

11      Here, as in *Leatherbury*, Naderi has not provided evidence that his knee injury limited his

12  ability to work. *See id.* (finding that the plaintiff had no proof other than his own opinion that his

13  osteoarthritic knees "actually interfered with his employment . . . ."). The fact that Naderi suffered

14  injury and underwent surgery is not enough; he must show that his disability actually interfered

15  with his employment. *See id.* Although he alleges that his injury prevented him from traveling to

16  Sophos meetings held overseas, which will be further addressed below, Naderi has testified in his

17  deposition and suggested in his Opposition that he was able to competently perform the essential

18  duties of his position up to the date of his discharge. *See* Brown Mot. Decl., Naderi Dep. at 109–

19  10, 147; Opp'n at 8–9; *Cf. Keshe v. CVS Pharmacy, Inc.*, No. 2:14-cv-08418-CAS(MANx), 2016

20  WL 1367702, at *8 (C.D. Cal. April 5, 2016) ("[P]laintiff concedes that he was able to perform all

21  of the essential functions required of [his position] without any accommodations. . . . Given that

22  plaintiff was able to perform his job duties, the Court finds that the harm to plaintiff's back is more

23  in the nature of an injury and does not constitute a qualifying disability under FEHA."

24  Furthermore, Naderi never took any medical leave or paid time off from work after his injury

25  occurred, demonstrating that the injury did not interfere with his day-to-day participation in work

26  activities. *Cf. id.* at *8; *Leatherbury*, 911 F. Supp. 2d at 880–81; *Arteaga*, 163 Cal. App. 4th at

27  347–49. Thus, Naderi's knee injury did not constitute a disability under FEHA.

28      The undisputed facts in the record establish that Naderi was not disabled as a matter of

United States District Court
Northern District of California

fact. First, Naderi's testimony belies the conclusion that he was disabled. For example, Naderi stated, "I was performing my duties at my job . . . via WebEx, conference calls, e-mails, and that seemed to be my primary way of continuing with my job, and that I could continue doing that with—with no issues." Brown Mot. Decl., Naderi Dep. At 109–10. That he could perform the duties of his job *with no issues* after the date of his injury is direct evidence that he was not disabled. No inference can be reasonably drawn to the contrary.

Second, in the form that he filed with California's Employment Development Department, Naderi stated—under penalty of perjury—that he was not too sick or injured to work and was otherwise able to accept fulltime work from July 13 to July 26. *Id.*, Ex. 28. During his deposition, Naderi testified that those statements were true. *Id.* at 136–37. Thus, shortly after his discharge and during his deposition, Naderi attested that he was not only physically capable of performing his duties as Sophos's Global MSP Program Director, but also physically capable of accepting other fulltime work during the week immediately before and the week immediately after his discharge. *Cf. Keshe*, 2016 WL 1367702, at *8 (finding the plaintiff had failed to establish that he was disabled in part because "his own disability insurance benefits claim form indicates that his disability began . . . several months *after* CVS terminated him.").

Naderi's claim that he was unable to travel does not change this conclusion.[9] There is no factual dispute that travel was not an essential duty of his position as Global MSP Program Director. "Essential duties" are the fundamental duties of the employment position that the individual with a disability holds or desires; they do not include the position's marginal functions. Cal. Gov't Code § 12926(f); *see also Achal,* 114 F. Supp. 3d at 797. Although the record suggests that Naderi spent a substantial amount of time traveling before his injury, travel is not explicitly mentioned in the extensive list of duties provided in Sophos's description of the Global MSP Program Director position and Naderi admits that his essential duties did not include travel.[10]

---

[9] Naderi's counsel acknowledged at the hearing that, were the Court to find that travel was not an essential duty, his disability discrimination claim would be "in trouble."

[10] At the hearing, Naderi expressly argued for the first time that travel was in fact an essential duty because his inability to travel affected his overall performance. However, Naderi failed to cite any evidence supporting this proposition. The evidence in the record is to the contrary, including

1    Indeed, Naderi has himself pointed to the description as competent evidence that the position's

2    duties did not include travel.  *See* Opp'n at 9.  As Naderi testified, "The travel part was nice to

3    have.  It wasn't necessary, since those field representatives had the primary contacts and

4    relationships, so I did not necessarily have to be in those regions, so I could take care of all of

5    those things remotely."  Brown Mot. Decl., Naderi Dep. At 109–10.  He also testified that he

6    could do the job through WebEx and conference calls, stating that he was communicating with the

7    team and it was working out well.  *Id.* at 147.  He further testified that no Sophos employee,

8    executive or otherwise, told him that he needed to travel.  *Id.* at 110.

9         The Court therefore concludes that Naderi has failed to establish that his knee injury

10   constituted a disability, the first element of a prima facie case for disability discrimination under

11   FEHA.  The claim therefore fails.

12                **D.    Failure to Reasonably Accommodate and Engage in the Interactive Process**

13        FEHA makes it unlawful "for an employer . . . to fail to make reasonable accommodation

14   for the known physical . . . disability of an applicant or employee."  Cal. Gov't Code § 12940(m).

15   Under FEHA, an employer's failure to reasonably accommodate a disabled employee is a

16   violation of the statute in and of itself.  *See id.*  To establish a prima facie case for his failure to

17   make reasonable accommodation claim, Naderi must demonstrate that (1) he suffered from a

18   disability; (2) he was qualified to perform the essential functions of the position; and (3) Sophos

19   failed to reasonably accommodate his disability.  *Scotch*, 173 Cal. App. 4th at 1010; *see also*

20   *Achal*, 114 F. Supp. 3d at 798.

21        FEHA similarly requires an employer "to engage in a timely, good faith, interactive

22   process with the employee . . . to determine effective reasonable accommodations, if any, in

23   response to a request for reasonable accommodation by an employee or applicant with a known

24   physical or mental disability . . . ."  Cal. Gov't Code § 12940(n); *see also Wilson v. Cnty. of*

25   *Orange*, 169 Cal. App. 4th 1185, 1193 (2009).  Although courts that have considered whether an

26

27   Naderi's deposition testimony.  Naderi testified, multiple times, that travel was not essential to his
     job and, moreover, he had adequately performed the duties of his job after his injury occurred.  *See*
28   Brown Mot. Decl., Naderi Dep. at 109–10, 147.

United States District Court
Northern District of California

1   employer failed properly to engage in an interactive process have not enumerated the elements of

2   a prima facie case, the claim requires Naderi to demonstrate that he suffered from a disability and

3   to identify a reasonable accommodation that Sophos was available to provide to him at the time

4   the interactive process should have occurred.  *See Nealy v. City of Santa Monica*, 234 Cal. App.

5   4th 359, 379 (2015); *Achal*, 114 F. Supp. 3d at 799–800.

6          As explained above, Naderi has failed to demonstrate that his knee injury constituted a

7   disability under FEHA, which defeats his accommodation and interactive process claims.[11]

8          However, even had Naderi demonstrated that he was disabled, he has failed to identify a

9   reasonable accommodation that Sophos was required to—but did not—provide to him at the time

10  the interactive process should have occurred.  First, a "[r]easonable accommodation" is a

11  "modification or adjustment to the workplace that enables a disabled employee to perform the

12  essential functions of the job held or desired."  *Taylor v. Trees, Inc.*, 58 F. Supp. 3d 1092, 1111

13  (E.D. Cal. 2014); *see also* Cal. Gov't Code § 12926(p); *Achal*, 114 F. Supp. 3d at 799–800.  As

14  explained above, no evidence supports the proposition that travel was an essential duty.  All

15  evidence is to the contrary: Sophos did not require Naderi to travel and, because he could

16  communicate with his colleagues by phone and computer, traveling was not otherwise necessary

17  for him to adequately perform the essential functions of his position.  *See* Brown Mot. Decl.,

18  Naderi Dep. at 109–10 (testifying that "[t]he travel part was nice to have.  It wasn't

19  necessary . . . ."), 147; Brown Mot. Decl., Valentine Dep. at 75.  Therefore, Sophos was not

20  obligated to provide Naderi with an accommodation for his inability to travel.

21          Second, Sophos permitted Naderi to work remotely, an accommodation that he has failed

22  to establish was insufficient to address his inability to travel.  "Reasonable accommodations may

23  include, among other things, job restructuring or permitting an alteration of when [or] how an

24  essential function is performed.  [Citations.]  . . .  The reasonableness of an accommodation

---

[11] At the hearing, Naderi's counsel acknowledged that the reasonable accommodation claim would be defeated if Naderi failed to establish that he was legally disabled.  Specifically, counsel stated, "If [Naderi is] not disabled, I think I'm going to have a really hard time standing in front of you and saying that he should be accommodated.  I hate to admit that . . . but it kind of blows the prima facie case."

generally is a question of fact. [Citation.]" *Nealy*, 234 Cal. App. 4th at 374; *see also Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 228 n. 11 (1999). To the extent that he was physically unable to travel after his injury, Sophos permitted Naderi to work from home, attend meetings telephonically, and communicate with his colleagues through email and WebEx. *See* Brown Mot. Decl., Naderi Dep. at 147. Naderi testified that these accommodations were sufficient to allow him to perform his essential duties. *See id.* Sophos therefore provided Naderi with reasonable accommodations that directly addressed his inability to be physically present during company meetings and conversations.

Likewise, Naderi testified that several Sophos employees helped him access needed data and review the MSP program. *See id.* at 150–52. Therefore, to the extent that he has asserted that he requested assistance in this respect, Sophos accommodated Naderi.

Finally, Sophos, having accommodated Naderi, was not required to provide him with a proxy or executive support—the only accommodations that Naderi has identified that Sophos did not provide. In light of the less burdensome accommodation of allowing Naderi to attend meetings and communicate with colleagues remotely, which was allowed, there is no requirement that the company provide the more burdensome and less reasonable accommodation of a proxy. *Cf. Hanson*, 74 Cal. App. 4th at 228 (explaining that the defendant had made other reasonable and effective accommodations available to the plaintiff and that the "employer is not obligated to choose the best accommodation or the accommodation the employee seeks."). Likewise, Naderi's injury did not entitle him or his program to preferential attention from Sophos's executives and decision makers. *Cf. Nealy*, 234 Cal. App. 4th at 375 ("[E]limination of an essential function is not a reasonable accommodation."); *Higgins-Williams v. Sutter Med. Found.*, 237 Cal. App. 4th 78, 84 (2015) (holding that an employee's inability to work under a particular supervisor's standard oversight is not a disability under FEHA).

"[T]he employee should be able to identify specific, available reasonable accommodations through the litigation process, and particularly by the time the parties have conducted discovery and reached the summary judgment stage." *Nealy*, 234 Cal. App. 4th at 379. Naderi's failure to do so defeats his accommodation claim.

1

### E.    The Remaining Claims

2      Because Naderi has failed to establish that he suffered from a disability or identify a

3 reasonable accommodation available during the time that he was injured which was not provided,

4 his remaining claims necessarily fail.[12]  *See Higgins-Williams*, 237 Cal. App. 4th at 752.  The

5 *Higgins-Williams* court explained that claims of retaliation for requesting accommodation and

6 wrongful termination in violation of public policy fail if "the undisputed facts show[] that [the]

7 plaintiff did not have a legally recognized . . . disability."  *Id.*  Likewise, Naderi's other claims of

8 disability discrimination in violation of public policy and retaliation in violation of public policy

9 fail.

10      The Court also finds Naderi's "failure to prevent" claim improper, as he has asserted it for

11 the first time in his Opposition.  *See Gilmour v. Gates, McDonalds and Co.*, 382 F.3d 1312, 1315

12 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a

13 new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a).  A plaintiff may not

14 amend [his] complaint through argument in a brief opposing summary judgment."); *accord*

15 *Stanford Hosp. and Clinics v. Humana, Inc.*, 5:13-cv-04924 HRL, 2015 WL 5590793, at *6, (N.D.

16 Cal. Sept. 23, 2015).  The Court therefore need not consider it before granting summary judgment.

17      Having found Sophos entitled to summary judgment on all Naderi's substantive claims, the

18 Court need not consider his request for punitive damages.  *See Gilmour*, 382 F.3d at 1315.

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25

26 _____

[12] The Court notes that Naderi does not assert a basis for finding that his remaining claims survive
27 summary judgment that is independent of his FEHA disability claim.  *See* Opp'n at 14.
Furthermore, Naderi does not discuss his claims for disability discrimination in violation of public
28 policy or retaliation in violation of public policy in his Opposition.

**IV.     CONCLUSION**

For the reasons stated above, the Motion is GRANTED.  The Clerk is directed to close the file.

**IT IS SO ORDERED.**

Dated: August 18, 2016

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California